UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALISON L. PETTY, | : |
| Plaintiff, | : **REPORT AND** |
| | : **RECOMMENDATION** |
| - against - | : |
| | : **12 Civ. 1644 (LTS) (RLE)** |
| CAROLYN W. COLVIN, | : |
| Defendant. | : |

To the HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:


## I. INTRODUCTION

*Pro Se* Plaintiff Alison Petty ("Petty") commenced this action under the Social Security

Act (the "Act"), 42 U.S.C. § 405(g) and/or 42 U.S.C. § 1383(c)(3), challenging a final decision

of the Commissioner of Social Security (the "Commissioner") denying her claim for disability

benefits.   Petty asks the Court to modify the decision of the Commissioner and grant her

monthly maximum insurance and/or Supplemental Security Income ("SSI") benefits, retroactive

to the date of her initial disability, or in the alternative, to remand the case for reconsideration of

the evidence.   Petty argues that the decision of the Administrative Law Judge ("ALJ") was

erroneous and not supported by substantial evidence.   On May 24, 2013, the Commissioner

moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, asking the Court to affirm the Commissioner's decision and dismiss the Complaint.

For the reasons that follow, I recommend that the Commissioner's motion be **GRANTED** and

the case be **DISMISSED.**

## II. BACKGROUND

### A. Procedural History

Petty applied for disability and social security benefits on June 23, 2009, stating that she had become disabled on April 8, 2009. (Transcript of Administrative Proceedings ("Tr.") at 15.) The application was denied on October 8, 2009, (*id.* at 53), and Petty requested a hearing before an Administrative Law Judge ("ALJ") on December 8, 2009. (Tr. at 61.) Petty appeared *pro se* before ALJ Gitel Reich on September 2, 2010, waiving her right to representation at the hearing. (*Id.* at 15.) The ALJ issued a decision on September 16, 2010, finding that Petty was not disabled within the meaning of the Act and was not eligible for disability benefits. (*Id.*) Petty requested a review of the ALJ's decision by the Appeals Council on September 30, 2010. (*Id.* at 8.) On December 7, 2011, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Petty's request for review. (*Id.* at 5.) Petty filed this Complaint on March 2, 2012.

### B. The ALJ Hearing

#### 1. Testimony on Behalf of Petty at the Hearing

Petty was born on March 29, 1971. (*Id.* at 104.) She is five feet, seven inches tall and weighs 130 lbs. (*Id.* at 110.) She graduated from college in 2002 with a Bachelor of Arts degree. (*Id.*) Petty worked as a telephone operator for a period of time around 1994, while she was in college. (*Id.* at 32.) Petty worked as a juvenile counselor at the Department of Juvenile Justice for ten years, from 1998 to April 8, 2009, and earned $1,400 biweekly. (*Id.* at 106, 108) She was formally terminated from her position at the Department of Juvenile Justice on April 8, 2010. (*Id.* at 106.)

2

On April 8, 2009, Petty was working as a counselor at the juvenile detention facility when a juvenile she was attempting to restrain bit her hand. (*Id*. at 20.) She was taken to the infirmary at the facility after the incident, and treated for the bite wound. (*Id*. at 261.) She testified that before the incident she "loved her work," but that after the incident, she developed post-traumatic stress disorder ("PTSD"). (*Id*. at 39.) Petty testified that she now experiences "mood swings," (*id*. at 39), feels like she is "coming in and out of the world," and does not have an appetite. (*Id*. at 37.) She testified that she drinks Ensure in order to gain weight. (*Id*. at 35.)

Petty stated that she began seeing a counselor to treat her mental health issues after the incident occurred. (*Id*. at 40.) She testified that she had a twenty percent loss of range of movement in her right arm as a result of the incident. (*Id*. at 34.) She stated that she attended physical therapy sessions and took medication to deal with the physical aspects of her hand injury. (*Id*. at 37.) Petty testified that she believed she was not able to work because of her hand injury. She also stated that her hand "shouldn't be that bad" if the type of work was "the correct fit," and while she could not return to her former job at the juvenile detention center, she "[didn't] have a problem" with any other type of job, as long as the work did not require extensive use of her hand. (*Id*. at 38-41.) She stated that she could lift up to twenty pounds and had no difficulty with reaching or turning pages. (*Id*. at 43.) Petty also stated that she applied for and started receiving unemployment benefits in June 2010, and that she had indicated she was willing and able to work when she applied for those benefits. (*Id*. at 33.)

Petty testified that she has not been employed since April 8, 2009, the onset of her disability. (*Id*. at 17.) She testified that she has been searching for a job by looking through online classifieds at the library once or twice a week. (*Id*.) In May 2009, she went to

3

Parkchester Medical Services ("Parkchester") in order to complete a pre-job physical required to initiate an application for a job as a state trooper. She testified that she began the application process for the job even though she was not able to work, because she would not be permitted to apply after she turned forty years old, and she wanted to make sure she had an application already on record by that date. (*Id.* at 36.) She further testified that she did not complete the application process, and no longer intends to seek the job. (*Id.*)

Petty's daily activities include going to church, listening to Gospel music, and walking her dog. (*Id.* at 47.) She also enjoys having her family members over for a visit, going on walks with them, and traveling to visit them in the South. She testified that she recently returned from a visit to see them in Mississippi and South Carolina. (*Id.* at 45.) Petty also testified that she prefers to keep to herself for most of the day, and does not see many people outside of her family members. (*Id.* at 46.)

## 2. Medical Evidence

### a. Parkchester Medical Health Services

Petty was treated by Dr. Simons at the Parkchester Medical Health Services Center ("Parkchester") from April 13, 2009, through June 20, 2009. Dr. Simons noted that Petty had received a bite mark from an inmate, which resulted in a "tiny laceration" on her right forearm. (Tr. at 261.) He also noted that Petty was administered a Hepatitis B and tetanus shot when she was treated at the infirmary at the juvenile detention facility, and he ordered a blood test to determine whether Petty had contracted HIV or Hepatitis C. (*Id.*)

Dr. Simons examined Petty a second time on April 23, 2009, and noted that there was no longer any evidence of the bite mark. He noted that Petty did not wish to return to her job

4

because she was "very depressed." (*Id.* at 260.) He diagnosed Petty with post-traumatic stress disorder[1] ("PTSD") and prescribed Lexapro and Citalopram to treat her depression. He also recommended that Petty drink Ensure to help her gain weight. Petty reported to Dr. Simon that she would be seeking a mental health counselor, and that her employer would pay for it. (*Id.*)

Dr. Simons examined Petty a third time on May 1, 2009. He informed Petty that her lab results were negative for HIV and Hepatitis C. (*Id.* at 262.) He noted that Petty had been "feeling better" after taking Citalopram, that her appetite had improved, and so had her wrist pain. (*Id.* at 259.) Dr. Simons recommended Petty continue taking Citalopram. (*Id.*)

Petty returned to Parkchester for a fourth appointment on May 14, 2009, where she reported to Dr. Simons that taking Citalopram helped her feel calmer, and that she had not yet begun to see a counselor because she was still waiting to get an appointment. (*Id.* at 258.) She also reported that she had been feeling tenderness in her right forearm. (*Id.*) Dr. Simons diagnosed her with a sprain to the right forearm and hand, recommended that she continue Citalopram, and told her to begin physical therapy for her arm. (*Id.*)

Petty's next appointment at Parkchester was on June 4, 2009. (*Id.* at 257.) Dr. Simons increased her dosage of Citalopram from ten milligrams to twenty milligrams, prescribed Periactin, and also recommended an EMG[2] for her upper extremities. (*Id.*) On June 15, 2009, Petty returned for another follow up appointment, and Dr. Simons increased her Citalopram to

---

[1] Post-traumatic stress disorder is a mental health condition that is triggered by a terrifying event. Symptoms may include flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event. Mayo Clinic, Post-traumatic stress disorder (PTSD), http://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/basics/definition/con-20022540 (last visited February 18, 2014).

[2] Electromyography (EMG) is a diagnostic procedure that uses electrical devices to record extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. *Dorland's Illustrated Medical Dictionary*, 537 (28th ed. 1994).

thirty milligrams. (*Id.* at 256.) Petty reported that the increased dosage "helped somewhat." (*Id.*) She also reported that she was feeling more pain in her arm. At her next appointment on June 30, 2009, Petty told Dr. Simons that she had pain in her hand constantly, and that she still felt depressed. (*Id.* at 255.) Upon examination, Dr. Simons determined that Petty had a mild spasm in the back, a full range of motion in her neck, and diminished sensation in her right hand. (*Id.*) He continued the Citalopram dosage and also prescribed Cymbalta. Petty had her final follow up appointment on July 20, 2009, where she continued to feel pain in her arm. (*Id.* at 254.) During several of these appointments, Dr. Simons treated her for shoulder pain with a Hot/Cold Pack, an "E-Stim – NON MCR," and a massage. (*See id.* at 265-71.)

On April 26, 2010, Dr. Simons submitted a "Certificate for Purposes of Return to Work or School" for Petty's place of employment. The certificate stated that Petty had been diagnosed with cervical radiculopathy[3] and PTSD, and indicated that Petty would be unable to work from April 13, 2009, to April 30, 2010, and could resume "restricted" duty thereafter with limited use of her right arm and no lifting of objects weighing more than twenty pounds. (*Id.* at 330.)

### b. Dr. Mitchell L. Kaphan, M.D.

Dr. Kaphan, an orthopedic surgeon, examined Petty on April 25, 2009, for an orthopedic evaluation and a physical examination of her right wrist injury. (*Id.* at 249.) Petty reported that an inmate bit her when she was attempting to restrain him, breaking the skin. Dr. Kaphan examined Petty and stated that there was evidence of bite marks near her wrist and some

---

[3]Cervical radiculopathy is a disease of the nerve roots in the neck. *Id.* at 303, 1404. The layperson's term for cervical radiculopathy is "pinched nerve." OrthoInfo, Cervical Radiculopathy (Pinched Nerve), http://orthoinfo.aaos.org/topic.cfm?topic=A00332&webid=24DAE050 (last visited February 25, 2014).

extensor tendinitis.[4]  (*Id.*)  He reported that Petty did not feel pain with resisted right extension and volar flexion,[5] and that there was no swelling or infection at the site of the bite mark.  (*Id.*) He concluded that Petty had suffered a "crush injury" to the right distal forearm[6] and was experiencing PTSD, but that with medication and counseling, her prognosis was "guarded to good."  (*Id.*)  Dr. Kaphan noted that Petty had a "100% temporary impairment," and that she could return to light duty, as long as she had no inmate contact.  (*Id.*)  Dr. Kaphan also referred Petty to a psychologist.  At follow up visits on May 9, 2009, and June 20, 2009, Dr. Kaphan examined Petty again and drew the same conclusions.

### c. Dr. Herb Meadow, M.D.

Petty saw Dr. Meadow for a psychiatric evaluation on September 21, 2009, for the filing of her Social Security claim.  Dr. Meadow found that Petty had no prior psychiatric history, and suffered from neck, back, and right arm pain.  He noted that Petty was experiencing a poor appetite, dysphoric moods, and difficulty concentrating.  (*Id.* at 276.)  He also noted that Petty was "well groomed," that her thought processes were "coherent and goal directed," and that her speech was "fluent and clear."  (*Id.* at 280.)  Dr. Meadow concluded that Petty was not in acute distress, that her gait was normal, and that she was able to rise from a chair and off an examination table without difficulty.  (*Id.* at 281.)  He diagnosed Petty with PTSD and an

---

[4]Tendinitis is the inflammation of tendons and tendon muscle attachments. *Dorland's Illustrated Medical Dictionary*, 1667 (28th ed. 1994).

[5]Volar flexion is the flexing of the palm, wrist, or hand.  *Id.* at 1836

[6]Distal refers to the furthest area from a point of origin.  The distal region of the forearm refers to the wrist. *Id.* at 497.

adjustment disorder[7] with depressed mood. (*Id.* at 278). He concluded that Petty was able to "perform all tasks necessary for vocational functioning," although she had a "moderate restriction for grasping, lifting, pushing and pulling with the right upper extremity." (*Id.*)

### d. Dr. William Lathan, M.D.

Petty was referred for an internal medicine examination with Dr. Lathan by the Division of Disability Determinations, in connection with her Social Security claim. (*Id.* at 280.) At her appointment on September 21, 2009, she reported a history of bronchial asthma and right hand pain. (*Id.*) After conducting several diagnostic tests, Dr. Lathan concluded that Petty had a "moderate restriction for grasping, lifting, pushing and pulling with the right upper extremity." (*Id.* at 282.) Because of her history of bronchitis, he recommended that she avoid smoke, dust, and noxious fumes.

### e. Dr. M. Morog, M.D.

Petty saw Dr. Morog for a Residual Functional Capacities ("RFC") assessment. Dr. Morog evaluated Petty's functional limitations, and found that she had a mild restriction of activities in daily living and a mild restriction in maintaining social function. (*Id.* at 302.) He also found that Petty had a moderate limitation in maintaining concentration, persistence, or pace. (*Id.* at 301.) Dr. Morog diagnosed Petty with PTSD and an adjustment disorder with depressed mood. (*Id.*) The physical RFC assessment indicated that Petty could occasionally lift or carry up to twenty pounds, could frequently lift or carry up to ten pounds, could stand or sit for approximately six hours within an eight hour period, and could push and pull with some

---

[7] An adjustment disorder is stress-related mental illness that causes depression and anxiety in response to a life change that the individual experiencing the disorder has difficulty coping with. Mayo Clinic, Adjustment disorders, http://www.mayoclinic.org/diseases-conditions/adjustment-disorders/basics/definition/con-20031704 (last visited February 18, 2014).

limitations in the upper extremities. (*Id.* at 306.) Dr. Morog concluded that while Petty did have a severe impairment in her right upper extremity, she was still able to perform the full range of light work with minimal restrictions. (*Id.* at 308).

The mental component of the RFC evaluation indicated that Petty was "well groomed," her speech was "fluent and clear," and her thoughts were "coherent and goal oriented." (*Id.* at 313.) The evaluation found that, although Petty suffered a severe impairment in the form of PTSD, the impairment was not enough to interfere with her ability to function daily. (*Id.*) The report concluded that Petty was able to perform the full range of simple tasks, despite her mental impairment. (*Id.*)

### f. Dr. Carl Eugene Wilson, M.D.

Dr. Wilson conducted an additional orthopedic evaluation of Petty on July 20, 2009, as part of her claim for Workers' Compensation. (*Id.* at 316.) Dr. Wilson noted that Petty had a small scar, less than 0.5 centimeters, over her distal right forearm with no signs of inflammation, erytherna,[8] or tenderness. (*Id.*) He found that Petty had a full range of motion in her right elbow, forearm, wrist, and fingers. (*Id.*) Dr. Wilson concluded that the injury had not resulted in any orthopedic disability or diminution of work ability. (*Id.*)

### g. Dr. Andrew Brown, M.D.

Dr. Brown conducted a medical evaluation for Petty as part of her claim for Workers' Compensation. (*Id.* at 327.) Dr. Brown concluded that Petty had developed cervical radiculopathy. Petty's symptoms included right wrist pain, numbness, tingling, and dropping

---

[8] An erythema is a name applied to redness of the skin produced by congestion of the capillaries. *Dorland's Illustrated Medical Dictionary*, 576 (28th ed. 1994).

objects due to weakness. (*Id.*) He found that, according to the New York Workers' Compensation Board Medical Guidelines, Petty had a 22.05% loss of use in her hand. (*Id.* at 328.)

### 3. The Findings of ALJ Gitel Reich

On September 16, 2010, ALJ Gitel Reich issued her decision that Petty was not disabled within the meaning of § 1614(a)(3)(A) of the Social Security Act, (Tr. at 15-23), and had not been disabled since June 23, 2009, the date her application was filed. Reich found that although Petty had a severe impairment in the form of pain from a healed bite on her right forearm and an adjustment disorder with depressed mood, Petty's impairments were not severe enough to meet or medically equal the criteria listed in "paragraph B," which would automatically direct a finding of disabled at Step 3 of the Sequential Evaluation Process. (*Id.* at 18.) To satisfy "paragraph B" criteria, a mental impairment "must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; repeated episodes of decompensation, each of extended duration." (*Id.*) According to Reich, Petty had at most a mild restriction in activities of daily living, and moderate difficulties in social functioning. (*Id.*)

Before advancing to Step 4 of the Sequential Evaluation Process, Reich determined Petty's mental and physical RFC. She found that Petty still retained the RFC to perform a wide range of "light" work.[9] (*Id.* at 16.) In making this decision, Reich used a two step process: first, she

---

[9]Light work involves "lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. § 416.967(b). Although the weight lifted may be very little, a job falls in this category "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

determined whether there was an underlying medical physical or mental impairment, and second, she determined the degree to which these impairments limit functioning. (*Id.*) Reich found that Petty's claims regarding her disability were inconsistent with the RFC assessment and were not supported by objective evidence to establish disability. (*Id.*)

Reich noted that Petty's physicians consistently found that she was not permanently disabled, and that despite her impairment, she was able to immediately return to performing "light" or "restricted" work. (*Id.* at 20.) Reich noted that Dr. Kaphan's report indicated that Petty had received an injury consistent with a bite with no infection or swelling, and had concluded that Petty's injuries were "100% temporary." (*Id.*) Reich noted that Dr. Kaphan's examinations concluded that Petty suffered PTSD, but she gave little weight to this conclusion because Dr. Kaphan was not a psychiatrist and his assessment had been based only on Petty's own statements. (*Id.* at 22.) Accordingly, Reich concluded that Petty's impairments were temporary, and would only impose a "light" restriction on her ability to work.

Reich noted that the September 2009 internal medical consultative evaluation by Dr. Lathan found that Petty had a "moderate" restriction for grasping, lifting, pushing, and pulling with her right extremity. She found that these results were consistent with the other evidence in the record. (*Id.* at 20.) Reich noted that Petty had claimed to have asthma, but the claim was not corroborated by any other evidence in the record. (*Id.*) Reich further noted that Petty's psychiatric consultative evaluation indicated that she was experiencing a depressed mood and PTSD, (*id.* at 21), but she gave little weight to the PTSD because it was not based on an examination, but on Petty's self-reported statements about her symptoms. (*Id.*)

Reich also found support in Petty's own testimony. (*Id.* at 19.) For example, Petty stated

11

that she did not have any problems working, but simply could not perform the same work that she had done before. (*Id.*) Petty also testified that she could work as long as she did not put too much stress on her hand, and indicated she would be willing to do reception work or case management. (*Id.*) Finally, Petty said that her hand was "not that bad," and that she was actively pursuing employment by looking through job listings in a local newspaper and online at the library. (*Id.*) Reich determined that these statements confirmed that Petty was capable of working in a job that would not "require extensive dealings with the public." (*Id.*)

While Reich examined the Workers' Compensation record submitted by Dr. Brown, which found that Petty had a 22.05% reduced use of her right hand, (*Id.* at 22), she gave little weight to this evidence because Workers' Compensation utilizes a different definition of disability than the Social Security Administration. (*Id.*)

Reich then found that although Petty was unable to perform any of her past relevant work, there are a sufficient number of jobs existing in the national economy that Petty would be able to perform, given her age, education, work experience, and residual functional capacity. (*Id.* at 22-23.) Accordingly, at Step 5 of the Sequential Evaluation Process, she determined that a finding of "not disabled" was appropriate under the framework of Medical-Vocational Rule 202.21.[10] (*Id.* at 23.)

---

[10]Social Security uses Medical Vocational Guidelines, or "Grid Rules," to determine whether an applicant is disabled, and to what extent he or she is disabled. Each grid looks at age, education, and previous work. "[W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations," the Grid Rules are used first to determine whether a finding of disabled "may be possible based on strength limitations alone," and if not, the Grid Rules "provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." 20 C.F.R. § 404 app. 2.

**C. Appeals Council Review**

After the ALJ's decision issued on September 16, 2010.  Petty's request for review by the

Appeals Council was denied on December 7, 2011.  (*Id.* at 5-7.)  No additional evidence was

submitted into the record.  (*Id.* at 1-4.)

### III. DISCUSSION

**A. Standard of Review**

A court reviewing a denial of Social Security benefits does not review *de novo* the

evidence in the record.  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *Jones v Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is limited to determining whether the

Commissioner applied the correct legal principles in making a decision and, if so, whether the

decision is supported by substantial evidence in the record.  42 U.S.C. 405(g); *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); *Johnson v.*

*Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," and must be "more than a mere scintilla."

*Richardson,* 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

The substantial evidence standard applies to findings of fact as well as inferences and

conclusions drawn from such facts.  *Marrero v. Apfel*, 87 F. Supp. 2d 340, 345 (S.D.N.Y. 2000);

*Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994).

If the Commissioner's decision that a claimant is not disabled is supported by substantial

evidence in the record, the court must uphold the decision.  42 U.S.C. § 405(g); *Jones,* 949 F.2d

at 59; *Arnone,* 882 F.2d at 34.  The court must uphold a denial of benefits supported by

substantial evidence even where substantial evidence may also support the plaintiff's position,

*Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990), or where a reviewing court's independent

conclusion based on the evidence may differ from the Commissioner's.  *Rutherford v.*

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert denied*, 459 U.S. 1212 (1983); *Schauer v.*

*Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).  While the ALJ must set forth the essential

considerations with sufficient specificity to enable the reviewing court to determine whether the

decision is supported by substantial evidence, he or she need not "explicitly reconcile every

conflicting shred of medical testimony." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.

1983) (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  A reviewing court gives

deference to the ALJ's evaluation since he or she observed the claimant's demeanor and heard

the testimony first-hand.  *Pena v. Chater*, 968 F. Supp. 930, 938 (S.D.N.Y. 1997), *aff'd sub nom.*

*Mejias v. Social Security Administration*, 445 F. Supp. 741, 744 (S.D.N.Y. 1978).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Act, every individual who is considered to be "disabled" is entitled to disability

insurance benefits.  42 U.S.C. § 423(a)(1).  The Act's definition of disability for the purposes of

disability insurance and SSI is substantially the same.  *Hankerson v. Harris*, 636 F.2d 893, 895

n. 2 (2d Cir. 1980).  A person is considered disabled when he or she is unable to engage in

substantial gainful activity by reason of any medically determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A); *Beauvoir v. Chater*, 104 F.3d

1432, 1433 (2d Cir. 1997). Establishing the mere presence of an impairment is not sufficient for

a finding of disability; the impairment must result in severe functional limitations that prevent

the claimant from engaging in any substantial gainful activity. 42 U.S.C. § 423(d)(2); *Rosa v.*

*Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). If a claimant is able to engage in his previous work

or other substantial gainful work, regardless of whether such work exists in the immediate area

in which he lives, whether a vacancy exists, or whether he would be hired for such work, he will

not be found disabled under the Act. *See* 42 U.S.C. §§ 423(d)(2)(A), and 1382c(a)(3)(B). For

the individual to be found disabled, both the medical condition and the inability to engage in

gainful activity must last for twelve months. *See Barnhart v. Walton*, 535 U.S. 212, 217-22

(2002).

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry: (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his ability to do basic work

activities; (3) if so, determine whether the impairment is listed in Appendix 1 of the regulations;

if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether

the claimant possesses the residual functional capacity ("RFC") to perform his past work despite

the disability; and (5) if not, determine whether the claimant is capable of performing other

work. 20 C.F.R. § 404.1520; *Rosa*, 168 F.3d at 77; *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29

(S.D.N.Y. 1999).

The Commissioner must assess the claimant's RFC to apply the fourth and fifth steps of the

inquiry. A claimant's RFC represents the most that the claimant can do despite his limitations.

15

20 C.F.R. § 416.945(a). The Commissioner must consider objective medical facts, diagnoses and medical opinions based on such facts, subjective evidence of claimant's symptoms, as well as the claimant's age, education, and work history. *Echevarria v. Apfel*, 46 F. Supp. 2d 282, 291 (S.D.N.Y. 1999); *Mongeur*, 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569 a. The ALJ is also required to evaluate the claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569a(c)(1)(i)

The claimant bears the burden as to the first four steps of the evaluation process, and the Commissioner has the burden of proving the fifth step. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). A claimant's own testimony regarding his daily activities often supports a finding that the claimant is capable of performing gainful activity. *See Pena*, 968 F. Supp. at 938. If the claimant can establish that his severe impairment prevents him from returning to his previous work, the burden shifts to the Commissioner to demonstrate that the claimant retains the RFC to perform alternative substantial gainful activity which exists in the national economy. *Gonzalez*, 61 F. Supp. 2d at 29. A finding of "not severe" should be made if the medical evidence establishes only a "slight abnormality" which would have no more than a minimal effect on an individual's ability to work. *Rosado v. Astrue*, 713 F. Supp. 2d 347, 358 (S.D.N.Y. 2010).

Additionally, the claimant's statements regarding pain and other symptoms will be considered by the Commissioner, but these factors alone will not establish disability. 20 C.F.R.

16

§ 404.1529(a).  Medical findings must support the conclusion that the claimant suffers from an impairment which could "reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [the individual] is disabled." *Id.* at §§ 404.1529, 416.929.  If the claimant's symptoms suggest a greater impairment than can be shown by objective evidence alone, other factors should be considered. *Echevarria*, 46 F. Supp. 2d at 292.  These factors include: (1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication taken by the individual to alleviate pain or symptoms; (5) treatment, other than medication, used to relieve pain; and (6) any other measures that the person uses or has used to relieve the pain or symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ may reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility. *See Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591-92 (2d Cir. 1984).  The ALJ, however, must give reasons "with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Echevarria*, 46 F. Supp. 2d at 292; *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984); *see Lugo v. Apfel*, 20 F. Supp. 2d 662, 663-64 (S.D.N.Y. 1998).

## 2. The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).  The treating physician's medical opinion as to the claimant's disability, even if retrospective, will control if it is well-supported by medically acceptable techniques and is not inconsistent with

substantial evidence in the record.   *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gonzalez*,

61 F. Supp. 2d at 29.  If the treating physician's opinion is not given controlling weight, the

Commissioner must nevertheless determine what weight to give it by considering: (1) the length,

nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion;

(3) the consistency of the opinion with the record as a whole; (4) the specialization of the

physician; and (5) any other relevant factors brought to the attention of the ALJ that support or

contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)(i-ii); *Schisler*, 3 F.3d at 567-69.  The

Commissioner may rely on the opinions of other physicians, even non-examining ones, but the

same factors must be weighed as enumerated above.  20 C.F.R. § 416.927(e).  More weight must

be given to a treating physician than a non-treating one and to an examining source as opposed

to a non-examining source.  20 C.F.R. §§ 404.1527(c)-(e), 416.927(c)-(e).

### 3. The ALJ Properly Reviewed and Considered the Evidence, and Applied the Correct Legal Principles

#### a.  The ALJ Applied the Five-Step Sequential Analysis

Petty asserts that the ALJ's decision "was erroneous, not supported by substantial evidence

on the record, and/or contrary to the law." (Petitioner's Complaint ("Pet'r Compl.") at ¶ 9.) The

Commissioner maintains that the ALJ properly applied the correct legal principles in reaching

his decision.  (Def.'s Answer at ¶ 9.)  This Court agrees with the Commissioner that the ALJ

followed the requisite sequential analysis in determining that Petty retained the residual

functional capacity to perform light work, and her finding of "not disabled" was supported by the

record.

To reach her conclusion, the ALJ conducted the tests required by 20 C.F.R. §§ 404.1520,

416.920.  At the first step, she determined that Petty had not engaged in any substantial gainful

activity since April 8, 2009, the alleged onset date of the disability.  (Tr. at 16.)  At the second

step of the process, the ALJ determined that Petty had a severe impairment in the form of

"residuals" from a healed bite on her forearm as well as an adjustment disorder with depressed

mood.  (*Id*. at 17.)  At step three, the ALJ determined that Petty did not have an impairment or

combination of impairments that meets or equals those listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 and thus Petty was not presumed disabled.  (*Id.*)  At step four, the ALJ determined

that Petty had the residual functional capacity to perform a wide range of light work, and that

Petty's impairments do not significantly impact her ability to perform the demands of light work.

(*Id*. at 18.)  The ALJ also determined at this step that Petty could not perform her past relevant

work as a counselor at a juvenile detention facility because of the limitations found by the RFC

assessment.  (*Id.*)  Ultimately, at step five of the analysis, the ALJ found that, given Petty's age,

education, work experience, and residual functional capacity, there are sufficient jobs in the

national economy that she would be able to perform.  (*Id*. at 22.)  The ALJ concluded that Petty

was "not disabled."

### b.  Substantial Evidence Exists to Support the ALJ's Determination

The ALJ reached her decision by observing Petty at the hearing and by examining the

evidence, including medical records and expert testimony.  At the first step of the process, the

ALJ gave appropriate weight to Petty's testimony about her work history to determine that Petty

had not engaged in any substantial gainful activity since April 8, 2009, the alleged onset date of

the disability.  (*Id.* at 16.)

At the second step, the ALJ utilized the evidence submitted by Petty's doctors to determine

that Petty had the following severe physical and mental impairments: "residuals of a healed bite

19

on her right distal forearm, and an adjustment disorder with depressed mood." (*Id.* at 18.) There was substantial evidence in the record to support the diagnoses. Petty's records at Parkchester Medical Health Services Center indicated that Petty had been bitten by an inmate, and as a result, had a "tiny laceration" on her arm as well as a depressed mood. (*Id.* at 260.) Dr. Morog's assessment indicated that Petty was experiencing a depressed mood. (*Id.* at 313.) Dr. Kaphan's reports noted that Petty had suffered a "crush" injury to the right distal forearm, and that there was evidence of bite marks on Petty's wrists. (*Id.* at 264.)

At the third step, the ALJ correctly determined that Petty's severe impairments were not within a listed category that would direct an automatic finding of disabled. There is no evidence in the record to support a conclusion of at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

At the fourth step, there is substantial evidence in the record to support the ALJ's determination that despite Petty's impairments, she has the residual functional capacity to perform a wide range of light work, as long as she is restricted to work that does not require more than "occasional dealing" with the public. (*Id.* at 18.) Dr. Simons's conclusion that Petty would be able to return to "light work" or "restricted duty" within two weeks of receiving the initial bite support the ALJ's decision. (*Id.* at 330.) Dr. Kaphan stated that Petty's prognosis was "guarded to good," and that Petty had full capacity to return to light work, as long as she did not return to her previous role as a counselor at a juvenile facility. (*Id.* at 249). Dr. Morog completed a psychiatric examination as part of Petty's mental RFC test and stated that Petty was

"well groomed," "spoke fluently and clearly," and had "coherent, goal-oriented thoughts." (*Id.* at 313.) While Dr. Morog determined that Petty had an adjustment disorder with depressed mood and PTSD, she concluded that these impairments would not interfere with Petty's ability to function daily, and that she would be able to perform a full range of simple tasks. (*Id.*) Dr. Morog also found that Petty retained the residual functional capacity to perform "light" work.

In her decision, the ALJ gave minimal weight to Dr. Simons's April 26, 2010 diagnoses of cervical radiculopathy and PTSD, stating that the diagnosis was "nowhere indicated or documented in the record" and that notes prepared contemporaneously with Petty's examinations did not support such a determination. (*Id.* at 22.) Dr. Simons's diagnoses were supported by medically acceptable techniques, and consistent with "substantial evidence in the record," including Petty's reports of tenderness, (*id.* at 260), diminished sensation (*id.* at 270), and mild spasms (*id.* at 255) in her arm, and nervousness, depression, and poor appetite (*id.* at 257). Therefore, according to the treating physician rule, the ALJ should have given the diagnoses greater weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gonzalez*, 61 F. Supp. 2d at 29. Dr. Simons concluded, however, that Petty was still able to work, as long as she limited use of her right arm and avoided lifting more than twenty pounds. Thus, even if Dr. Simons's diagnoses of cervical radiculopathy and PTSD had been given the appropriate weight, the record would still support the ALJ's finding that Petty was not disabled.

The ALJ also gave minimal weight to Dr. Kaphan's diagnosis of PTSD because he was not a psychiatrist, and because there was nothing in the record to support the diagnosis. (*Id.* at 22.) An ALJ may decide not to give controlling weight to a treating physician's opinion if the physician lacks specialization in the area diagnosed. 20 C.F.R. §§ 404.1527(c)(2)(i-ii); *Schisler*,

21

3 F.3d at 567-69.  The ALJ may also give less weight to a non-examining source than an examining source.  20 C.F.R. §§ 404.1527(c)-(e), 416.927(c)-(e).  Because Dr. Kaphan is not a psychiatrist and did not perform a psychiatric evaluation when diagnosing Petty with PTSD, the ALJ was authorized to give the diagnosis less than controlling weight.  Notwithstanding this conclusion with respect to Dr. Kaphan, the ALJ did find that Petty had a "limited" history of psychiatric treatment at Parkchester, and determined that Petty is restricted to working in environments that would require minimal dealings with the public.  (*Id.* at 22.)

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, and must consider their findings as opinion evidence.  20 C.F.R. § 416.927.  They are given weight according to criteria such as the consultant's medical specialty, expertise in the rules of the Act, the length of the doctor-patient relationship, and whether or not the physician conducted examinations.  (*Id.*)  Dr. Meadow and Dr. Lathan both submitted reports as part of a consultative evaluation done on behalf of the New York State Division for Disability Determination for purposes of Petty's Social Security claim.  Dr. Lathan, who conducted the internal physical examination, noted that Petty had only a moderate restriction for movement in her upper right extremity.  Dr. Meadow diagnosed Petty with PTSD and an adjustment disorder with depressed mood,  (*id.* at 278), and found Petty able to "perform all tasks necessary for vocational functioning," providing that there is a "moderate restriction for grasping, lifting, pushing and pulling with the right upper extremity."  (*Id.*)  Dr. Meadow and Dr. Lathan each examined Petty once and did not provide treatment.  Although the ALJ gave their assessments minimal weight, their conclusions were consistent with the ALJ's findings.

The ALJ gave little weight to Dr. Brown's opinion that Petty has suffered a 22.05% loss in her hand, and that this was a sufficient basis for a finding of disability.  Dr. Brown had reached this conclusion utilizing the criteria established for determinations of disability under Workers' Compensation.  (*Id.* at 328.)  Since Workers' Compensation utilizes different standards for determinations of disability for the purposes of awarding benefits than the standards under the Act, opinions rendered for the purposes of Workers' Compensation are not binding on the Commissioner.  *Miller v. Astrue*, 538 F.Supp. 2d 641, 649 (S.D.N.Y. 2008).  Therefore, the ALJ was not bound to give controlling weight to conclusions rendered for the purposes of Workers' Compensation.  For the same reasons, the ALJ gave little weight to reports submitted by Drs. Wilson and Brown for purposes of Workers' Compensation, which stated that there was no orthopedic disability or diminution of work ability as a result of the bite Petty suffered.  (*Id.* at 316.)

Petty's statements at her hearing also provided evidence for the ALJ's finding that her impairments would not prevent her from being able to perform a range of light work.  She stated at the hearing that her hand injury was "not that bad," and that she was willing to work as long as the work was the right fit.  (*Id.* at 41.)  While Petty stated that she strongly believed that she could not return to her previous work as an inmate counselor, she suggested that she could work as a receptionist or a case manager.  (*Id.*)  Additionally, while Petty stated that she did not have an appetite and experienced mood swings, her testimony on her activities of daily living demonstrates that she is highly functioning.  (*Id.* at 39.)  She testified at her hearing that she regularly walked her dogs, occasionally took walks with family members, and went to the library to perform searches on the computer.

Ultimately, at step five of the analysis, the ALJ relied on Petty's testimony about her activities of daily living, as well as the evidence submitted into the record by Petty's doctors, to find that given Petty's age, education, work experience, and residual functional capacity, there are sufficient jobs in the national economy that Petty would be able to perform. There is no evidence in the record to suggest that Petty's impairments are permanent, nor any to suggest that they would act as anything more than a mild restriction in allowing her to find work. Accordingly, the ALJ's decision that Petty is not eligible for Social Security Insurance benefits was determined under the correct legal standard and supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Defendant's motion be **GRANTED**, and that the Complaint be **DISMISSED**.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Laura Taylor Swain, 500 Pearl Street, Room 1320, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall consitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 149-150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)(c) (West Supp. 1995); Fed.R.Civ.P. 72(a), 6(a), 6(d).

DATED: March 5, 2014
New York, New York

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

Copies of this Report and Recommendation were sent to:

**MAILED BY CHAMBERS**